**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
NIR VELOZNY, on behalf of the minor children    :
R.V., N.V., and E.V.                            :
                                Petitioner,     :        MEMORANDUM DECISION
                                                :             AND ORDER
                                                :
                -against-                        :
                                                :        20 Civ. 6659 (GBD)
TAL VELOZNY,                                    :
                                                :
                                Respondent.     :
                                                :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, District Judge:

Petitioner Nir Velozny, an Israeli citizen, petitions this Court for the return of his children,

R.V., N.V., and E.V., ages 15, 12, and 4, respectively, to Israel pursuant to the Hague Convention

on Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343

U.N.T.S. 89 ("Hague Convention") and its domestic implementing legislation, the International

Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. ("ICARA").   Petitioner moved for

summary judgment, arguing that the children were wrongfully removed and are being wrongfully

retained in the United States by their mother, Respondent Tal Velozny, who currently resides in

New York.   (Petr.'s Mot. for Summ. J. ("Petr.'s Mot."), ECF No. 38.)   Respondent opposes

Petitioner's motion and asserts several affirmative defenses under the Hague Convention. (Respt.'s

Opp'n to Petr.'s Mot. for Summ. J. ("Respt.'s Opp'n"), ECF No. 53.)   Petitioner's motion for

summary judgment is GRANTED.   As a result, Petitioner's petition for the repatriation of the

children to Israel is GRANTED.

## I.   FACTUAL BACKGROUND

As with most Hague Convention cases, this case arises out of marital strife.  Petitioner, Nir Velozny, is an Israeli citizen who currently resides in Israel.  (May 25 Hr'g Tr. at 2:18-3:24.) Respondent, Tal Velozny, a U.S. citizen, is Petitioner's wife and currently lives in New York.  (*Id*. at 152:17-19; 153:24-25.)  The couple first met in 2001, were married in 2002 (in both the United States and Israel), and moved to Israel in 2005.  (*Id*. at 153:11-12; 156:25-157:8.)  The couple has three minor children: R.V., N.V., and E.V, all of whom were born in Israel.  (Respt.'s Response to Petr.'s Local Rule 56.1 Statement ("Respt.'s Rule 56.1 Stmt."), ECF No. 55 at ¶¶ 2, 3.)  Petitioner and Respondent shared a home in Tel Aviv with their children until approximately July 2019.  (*Id*. at ¶ 7.)  Around that time, Petitioner moved out of the family home and informed Respondent that he wanted a divorce.  (*Id*.  at ¶¶ 6, 9.)

In August 2019, Petitioner filed a petition with the State of Israel Rabbinical Courts to initiate a divorce proceeding.  (*Id*. at ¶ 10.)  An initial divorce proceeding before Israel's Rabbinical Court was scheduled for October 2, 2019.  (*Id*. at ¶ 11.)  The parties, through counsel, began negotiating a divorce and custody agreement and counsel held two meetings in August.  (*Id*. at ¶ 12.)  After one meeting, Petitioner's Israeli counsel instructed Respondent's Israeli counsel that the children were not to leave Israel without Petitioner's consent.  (*Id*. at ¶ 13.)  The parties never executed the divorce and custody agreement.

On September 28, 2019, just days before they were to appear before the Rabbinical Court, Respondent booked a round-trip ticket for her and the children from Tel Aviv to the United States. (*Id*. at ¶ 16.)  Respondent left in secret, never informing Petitioner that she was moving the children to New York.  (*Id*. at 17; June 1 Hr'g Tr. at 291:17-19.)  Nor did she tell the children that they were going to stay in the United States.  (June 1 Hr'g Tr. at 291:20-22.)  Petitioner discovered that

Respondent and the children had left Israel when he went to the family home on September 28th to check in with the children before the start of Rosh Hashana and found it dark. (Respt.'s Rule 56.1 Stmt. at ¶ 18.)  Petitioner went to Respondent's parent's home where he was told by the doorman that Petitioner had left for the airport.  (*Id*.)  Petitioner next went to the police station, where the police confirmed that Respondent and the children had left Israel. (*Id*.)  Respondent and the children have remained in New York (and not returned to Israel) since September 2019.  (*Id.* at ¶ 19.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it "might affect the outcome of the suit under the governing law."  *Gayle*, 313 F.3d at 682 (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.  *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).  In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact.  *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002).  To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114

3

(2d Cir. 1998)) (internal quotation marks omitted).  Rather, the opposing party must produce admissible evidence that supports its pleadings.  *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968).  In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment."  *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor.  *See id*.  However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact."  *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation and internal quotation marks omitted).  Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  *Marvel*, 310 F.3d at 286.

### III.   PETITIONER HAS ESTABLISHED A PRIMA FACIE CASE UNDER THE HAGUE CONVENTION

The Hague Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence."  Hague Convention, Preamble.  The Convention was enacted "in response to the problem of international child abductions during domestic disputes," *Abbott v. Abbott*, 560 U.S. 1, 8 (2010), and the drafters of the Convention "were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken."  *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (internal quotation marks omitted).  Given these concerns, the Convention seeks

to restore the status quo by securing "the prompt return of children wrongfully removed or retained" in any signatory state.   Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Child Abduction Convention, Acts and Documents of the 14th Session, vol. III 426, 429, ¶ 16 (1982) (the "Pérez-Vera Report").   Israel and the United States have been treaty partners under the Convention since December 1, 1990.   *See* https://il.usembassy.gov/u-s-citizen-services/international-parental-child-abduction/.

A court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claim and cannot consider the merits of any underlying custody disputes.   *See* Hague Convention, art. 16.   "[T]he Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings." *Mota*, 692 F.3d at 112; *see* 22 U.S.C. § 9001(b)(4) (providing that a court may only determine rights under the Convention, not the merits of custody disputes).   Thus, a court's inquiry in a Hague Convention case is not "'the best interests of the child,' as it is in a state custody case; rather it is the specific claims and defenses under the Convention." *Hazbun Escaf v. Rodriguez*, 200 F.Supp.2d 603, 610–11 (E.D.Va. 2002).

A person may exercise their rights under the Hague Convention by filing a petition in a court "authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."   22 U.S.C § 9003(b).   Article 3 of the Hague Convention states that the "removal or retention of a child is to be considered wrongful where [(a)] it is in breach of the rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually a resident immediately before the removal or retention; and [(b)] at the time of removal or retention those rights were actually exercised, either

jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention, art. 3.

Thus, for a petitioner to prevail on a claim under the Hague Convention, he or she must demonstrate: "(1) that the child was habitually resident in one State and has been removed to or retained in a different State; (2) that the removal or retention was in breach of the petitioner's custody rights under the laws of the State of habitual residence; and (3) that the petitioner was exercising those rights at the time of the removal or retention." *Nissim v. Kirsh*, 394 F. Supp. 3d 386, 392 (S.D.N.Y. 2019). "A petitioner must establish each of these elements by the preponderance of the evidence." *Taveras v. Morales*, 22 F.Supp.3d 219, 230 (S.D.N.Y. 2014).

Here, the undisputed facts show that Petitioner has established each element of a prima facie case under the Hague Convention. The United States and Israel are both signatories to the Convention. The three children are all under the age of 16, were each born in Israel, went to school exclusively in Israel, and carried Israeli and American passports. (Respt.'s Rule 56.1 Stmt. at ¶¶ 1–4.) The children were habitual residents of Israel. There is also no dispute that Petitioner had custody rights under Israeli law and was exercising those rights at the time the children were removed from Israel. (*Id*. at ¶¶ 7, 9.) Petitioner lived with Respondent and the children until approximately July 2019. (*Id*.) After moving out of their shared home, Petitioner continued to make attempts to visit and contact the children until they were removed from Israel. (Respt.'s Rule 56.1 Stmt. at ¶¶ 7, 9.) Respondent does not dispute Petitioner's custody rights or that those rights were being exercised. Respondent alleges that Petitioner left the family home due to his own "volatile behavior," but this does not establish that Petitioner failed to exercise his custody rights. *See Friedrich v. Friedrich*, 78 F.3d. 1060, 1066 (6th Cir. 1996) (a "person cannot fail to 'exercise'

custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.")

Accordingly, Petitioner has satisfied his burden under the Hague Convention and ICARA and established that the surreptitious removal of the children by Respondent to New York was wrongful.

## IV.   RESPONDENT HAS FAILED TO SHOW THAT THERE ARE ANY DISPUTED MATERIAL FACTS THAT SUPPORT HER AFFIRMATIVE DEFENSES

"[O]nce a [petitioner] establishes that removal was wrongful, the child *must be returned* unless the defendant can establish one of four defenses." *Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999) ("*Blondin II*") (quoting *Friedrich*, 78 F.3d at 1067) (emphasis added).   The Convention provides four potential defenses: (1) that judicial proceedings were not commenced within one year of the child's abduction and the child is well settled in the new environment, Hague Convention, art. 12; (2) that the person seeking return of the child consented to or subsequently acquiesced in the removal or retention, *id.* at art. 13(a); (3) that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation", *id.* at art. 13(b); or (4) that return of the child "would not be permitted by the fundamental principles . . . relating to the protection of human rights and fundamental freedoms." *Id.* at art. 20.   In addition to these enumerated defenses, a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Id.* at art. 13.   This last defense is often referred to as the mature child exception or "age and maturity defense." *Laguna v. Avila*, 2008 WL 1986253, at *6 (E.D.N.Y. May 7, 2008).

Each defense is to be interpreted narrowly, lest they "frustrate a paramount purpose of that international agreement—namely, to 'preserve the status quo and to deter parents from crossing

international boundaries in search of a more sympathetic court.'" *Blondin II*, 189 F.3d at 246 (quoting *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993)).  Moreover, even where a defense has been established, a court need not allow the child to remain with the "abducting" parent. *Id.* at 246 n. 4.

Respondent argues that the consent or acquiescence defense and the grave risk defense apply in this case.  Respondent also asserts that this Court should consider the "objections" of R.V. and N.V. and apply the mature child exception.

### A.  Petitioner did Not Consent or Acquiesce to the Removal of the Children

Article 13(a) of the Hague Convention provides that a court "is not bound to order the return of the child if the person . . . [who] opposes its return establishes that – the person . . . having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention."  Hague Convention, art. 13(a).  The consent and acquiescence defenses are distinct from one another, and both exceptions are narrow.  *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005); *Blondin II*, 189 F.3d at 246.  In order to establish this affirmative defense, the respondent must prove by a preponderance of the evidence that petitioner either previously consented or subsequently acquiesced to the removal of the children.  22 U.S.C. § 9003 (e)(2)(B).

The consent defense analyzes "the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  *Baxter*, 423 F.3d at 371.  While "consent needn't be formal," *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1359 (11th Cir. 2020), it is "important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country."  *Baxter*, 423 F. 3d at 371.  "The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent."  *In re Kim,*

404 F.Supp.2d 495, 516 (S.D.N.Y. 2005).   "A showing of acquiescence requires a higher degree of formality; either a formal statement by petitioner or a consistent attitude of acquiescence over a significant period of time." *Laguna*, 2008 WL 1986253, at *7.

### i.   Consent

Respondent argues that Petitioner consented to the children's relocation to New York during the parties' divorce negotiations, and that the parties disagreed only on "how much money Petitioner would extract from Respondent's family to pay his extraordinary debts." (Respt.'s Opp'n at 2; *see also* Respt.'s Post-Hr'g Br. at 14; Respt.'s Post-Hr'g Reply Br. at 6 ECF 78.) This argument is belied by the undisputed evidence.

Respondent claims that on August 26, 2019, Petitioner—via his Israeli counsel— consented to Respondent moving with the children to New York. (*See*, *e.g.* Respt.'s Opp'n at 19.) To support this argument, Respondent relies upon the declaration of her Israeli counsel (Racheli Bash) and two unsigned draft agreements drawn up by Ms. Bash and shared with Petitioner's Israeli counsel. (Decl. of R. Bash ("Bash Decl."), ECF No. 49 at ¶¶ 10–11.) Ms. Bash's declaration states that Petitioner's counsel "immediately agreed that [Respondent] and the children would move to the United States," and that "negotiations were conducted on the issue of [Petitioner's] debts [paid] by [Respondent] through her parents, and [Petitioner's] visitation agreements . . ." (*Id*. at ¶ 11.) Ms. Bash goes on to state that Petitioner's Israeli counsel "never told me that [Respondent] and the children's move to the United States was against [Petitioner's] wishes." (*Id*. at ¶ 18.) These claims are unpersuasive for two reasons.

First, it is undisputed that on August 27, 2019, Petitioner's Israeli counsel informed Ms. Bash that the children were not to leave Israel without the Petitioner's consent. (Respt.'s Rule 56.1 Stmt. ¶ 13.) This undisputed fact, admitted to by Respondent, undermines the statements in

Ms. Bash's declaration and the argument that Petitioner consented to the removal of the children to the United States.

Second, it is undisputed that the agreements laying out the terms of the parties' divorce and their child custody arrangement were in draft form and unexecuted.  At the evidentiary hearing, Respondent conceded that no finalized or executed custody agreement existed at the time of the removal.  (June 1 Hr'g Tr. at 290: 17-19) ("Q. You never signed a copy of any sort of custody or separation agreement with Mr. Velozny, correct? A. Yeah.")  Notably, paragraph 8 of the agreement which considers the children moving and being educated in the United States is incomplete.  The final sentence of the paragraph states "It is agreed that the children will move to residence in the US together with the mother on the date of _____."  (*See* Hr'g Exs. R-F and R-G at ¶ 8.)  The parties were clearly in negotiations about the terms of their divorce, child custody, and visitation arrangements, but it is also clear that no agreement was ever reached.  *See Freier v. Freier*, 969 F. Supp. 436, 444 (E.D. Mich. 1996) ("Although the Court is satisfied Petitioner and Respondent has discussed a move back to Michigan, there is no indication on this record Petitioner knew that Respondent intended such a move on June 30 or that she would decide to wrongfully retain the children after vacation.")

Moreover, while the draft agreement contemplates that the children would move to the United States, the arrangement was also clearly conditional.  Among other things[1], the draft agreements provide that the children are to make two annual trips to Israel to visit Petitioner.  (Hr'g Ex. R-G at ¶13. A.)  The draft agreement also provides that Petitioner would be allowed to visit the children in the United States and that Respondent would pay for "2 flight tickets a year – there

---

[1] The draft agreement also includes provisions regarding the parties' divorce, which were never finalized. Indeed, the parties remain married. (June 1, 2021 Hr'g Tr. at 314: 7-9) ("Q. And you stayed married to him until – well, I guess you are still married, correct? A. Unfortunately, yes.")

and back." (*Id*. at ¶14. F.)   In addition to planning the logistics of these visitation trips, the agreement also contemplates the payment by Respondent of "the husband's debts up to 350,000 ILS through a loan she will take out herself," as well as the "transfer to the husband a sum of 200,000 ILS . . . to participate in the children's expenses while they stay with the father."   (*Id*. at ¶¶ 18, 25.)   These conditions were never satisfied.   Thus, even if Petitioner had conditionally agreed to the removal, such agreement was nullified by the failure of these conditions.  *See Hofman v. Sender*,  716 F.3d. 282, 295 ("Because the condition on which [the petitioner] consented to his children moving to the United States was not met, there is no basis to conclude that he consented to [the respondent's] retention of the children in the United States.")

Also unavailing is Respondent's contention that Petitioner's communications in the years prior to her removal of the children to New York evidence consent.   Respondent argues that emails between Petitioner and his father-in-law show that Petitioner intended and consented to the children being sent to New York.   (*See* Respt.'s Post-Hr'g Br. at 14.)   There is no dispute that Petitioner struggled financially, sought the help of his father-in-law, and wanted his in-laws to financially care for his children in the event he was unable.   (May 25, 2021 Hr'g Tr. at 53:2-5.) However, upon a complete review of these email communications, it is clear that Petitioner did not consent to the removal of the children to United States.   (*See* Exhibit D, ECF No. 54-4, May 7, 2018 Email from Petitioner to Respondent's father ("Just take care of Tal and the kids for me if I……."); Exhibit G, ECF No. 54-7, March 6, 2017 Letter from Petitioner to Respondent's father ("I do not have life insurance or a secret bank account, Tal and the children will come to New York, and then you will pay double what you paid in Israel?")).   Both of these exhibits lack any indication of affirmative consent.   Indeed, Petitioner's March 6, 2017 statement about lacking life insurance or a secret bank account, coming two and a half years before the removal of the children

from Israel, was part of a string of rhetorical questions about the consequences of actions he was contemplating due to his mental health struggles at the time, rather than consent to the children's removal.[2]

Tellingly, the record also shows that Petitioner addressed and rejected the possibility of sending the children to New York. (*See* Hr'g Ex. R-FF, February 10, 2018 Email from Petitioner to Respondent's father.) Petitioner wrote "So I'm sitting and writing my thoughts after another night without sleep on what to do now at 5:54 am. To disappear? To send tal and the kids to ny? *Will not solve anything* and I also love my family." (*Id*.) (emphasis added.) Respondent selectively quotes this exhibit in her post-trial briefing, ending the quote before Petitioner's rejection of the idea of sending the children to New York. (Respt.'s Post-Hr'g Br. at 14.) While Respondent would like to characterize this as Petitioner's subjective intent to allow the children to be removed to the United States, when viewed in context, it is clear that he dismissed this idea. Based on this evidence, no reasonable jury could find that Petitioner consented to Respondent's permanent removal of the children from Israel.

Respondent's conduct is also inconsistent with those of someone who believed that removal was consented to. The "deliberatively secretive nature of [the] actions [of the removing parent] is extremely strong evidence that [the other parent] would not have consented to the removal." *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (quoting *Friedrich*, 78 F.3d at 1069). Here, it is undisputed that Respondent removed the children from Israel on September 28,

---

[2] The full quote reads: "The truth, that I was thinking of running away from it all or even suicide. I gained weight and smoked 2 packs a day, but then all the questions and thoughts came up, to end my life because of money? What will they tell my children about their father? That Nir despaired and thought only of himself? I want my children to be strong, and to know how to lead and not give up when it is difficult! How will you and the family accept it? My friends and family? People bigger than me have fallen, risen, and succeeded, so why can I not? I have design capabilities and solutions, why not succeed? I do not have life insurance or a secret bank account, Tal and the children will come to New York, and then you will pay double what you paid in Israel?" (Exhibit G, ECF No. 54-7.)

2019 (during the school year) and did not tell Petitioner that she was bringing the children to the United States. (June 1 Hr'g Tr. at 290-291:22.) Respondent also did not tell the children that they were going to the United States or that they were going to be living in the United States. (*Id.* at 291:20-22; Hr'g Ex. R-ZZ (Yohananoff Report.)) Simply put, had Petitioner actually consented to the children being removed from Israel, there would have been no need for Respondent's surreptitious conduct.

### ii.    Acquiescence

An acquiescence defense "requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070. Where, as here, "a petition for the return of the children is filed prior to the end of the statutory period, courts will find acquiescence in only a limited set of scenarios." *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1290 (S.D. Fla. 1999). Accordingly, "[e]ach of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Friedrich*, 78 F.3d at 1070.

Respondent's assertion that Petitioner subsequently acquiesced to the children's removal, based on a text message from Petitioner telling her to "stay there" the day after she arrived in New York, does not meet the level of formality required for this defense. (Hr'g Ex. R-I; Respt.'s Post-Hr'g Br. at 15.) Petitioner has actively pursued his rights under the Hague Convention by seeking counsel and filing a timely petition after learning from the Israeli police that Respondent and the children had left Israel. *Baxter*, 423 F.3d at 372 (finding no consent or acquiescence where the petitioner "has vigorously objected [to the removal] and pursued his rights under the Convention"); *In re Interest of Zarate*, No. 96 C 50394, 1996 WL 734613, at *3 (N.D. Ill. Dec. 23, 1996)

13

("[E]fforts by petitioner continued during the time the child was being retained in this country and eventually led to petitioner retaining legal counsel and filing suit under the Act.  All of this conduct exhibits anything but a consent to, or acquiescence in, the retention of the child.").  Thus, the acquiescence defense is inapplicable.

### B.  Respondent's Grave Risk of Harm Defense

Article 13(b) of the Hague Convention provides that a court "is not bound to order the return of the child" if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).  A respondent must establish this defense by "clear and convincing evidence." *In re Lozano*, 809 F. Supp. 2d 197, 220 (S.D.N.Y. 2011).

"[A] grave risk of harm from repatriation arises in two situations: '(1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.'" *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (quoting *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001) ("*Blondin IV*")).  "The potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high." *Id*.  "The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize." *Id*.

The Second Circuit has described the grave risk determination as falling on a spectrum: "at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real

risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do." *Blondin IV*, 238 F.3d at 162.

If a court finds there is a grave risk to the child, it must then take into "account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." *Blondin II*, 189 F.3d at 248–49.

As with the entirety of the Hauge Convention analysis, the focus of the grave risk inquiry is "not the relationship between the two parents or the desirability of one party having custody." *Souratgar v. Fair*, 2012 WL 6700214 at *7 (S.D.N.Y. 2012).  Rather the focus is on whether the return of the children to the country they were removed from will create a true risk of harm to the children.

### i.   Risk from Exposure to Spousal Abuse

The grave risk defense has been found to be satisfied where respondents show "a sustained pattern of physical abuse and/or a propensity for violent abuse that presented an intolerably grave risk to the child." *Souratgar*, 720 F.3d at 104.  Additionally, spousal abuse can establish a grave risk of harm "when it occurs in the presence of the child." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014); *see also Souratgar*, 720 F. 3d at 103-104 (stating that spousal abuse is relevant only insofar as it "seriously endangers the child.")  Importantly, "[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Souratgar*, 720 F. 3d at 104. "The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Id*.

It is undisputed that in July 2019 Petitioner and Respondent had an argument while in Petitioner's car.  Petitioner also does not dispute that after parking the car in front of the family home he forcibly removed Respondent from the car by grabbing her arm, resulting in a bruise on Respondent's arm.  (May 25 Hr'g Tr. at 107:18 -109:1; *see also* Hr'g Ex. R-E.)   Petitioner also admitted that, three- or four-times during arguments, when Respondent would "come to [his] face" he would "push her back."  (*Id*. at 75:8-18.)  Respondent's testimony confirms these events, but noticeably absent is any evidence that these events took place in front of the children.  Domestic violence of any kind is pernicious, but under the Hague Convention the role of this Court is to determine what risk, if any, the children face if returned to their habitual residence.  Respondent has not established any facts that these altercations were anything more than sporadic and isolated, or that they have had any impact upon the children.[3]

Respondent relies heavily on *Davies v. Davies* and asserts that Petitioner's conduct is similar to the conduct at issue in that case.  (Respt.'s Post-Hr'g Br. at 8.)   Such reliance is misplaced.  In *Davies*, the district court found that the father screamed in his pregnant wife's face to the point that he caused her to convulse, and would (on more than one occasion) forcibly rip their baby from his wife's arms and scream obscenities at the baby.  *Davies v. Davies*, 2017 WL 361556, at *4–7 (S.D.N.Y. Jan. 25, 2017), *aff'd*, 717 F. App'x 43 (2d Cir. 2017).  Mr. Davies' conduct was also directed toward his child.  Davies slapped the child on his behind so hard he left

---

[3] Respondent also alleges that during an argument Petitioner once threw an axe in the direction of a room where the children where playing. (June 1 Hr'g Tr. at 240:4-241:7.)  Respondent claims that the axe hit the playroom door and that the children observed the incident.  (*Id*.)  Notably, neither R.V. nor N.V. reported this incident during their interviews with either party's forensic experts.  Furthermore, while it is undisputed that Petitioner punched a wall on the way into the basement after an argument, there is also no evidence that this event was witnessed by the children.  N.V. did not report this incident to either parties' expert, though he did recall verbal arguments that he could not recall the details of. (Hr'g Ex. R-ZZ at 14.) R.V. was asked directly about this incident and said that "he heard a loud noise but did not know how it happened."  (*Id*. at 18.)

a handprint, slammed the car brakes when angry that his child was not wearing a seatbelt, and forcefully pushed the child out of a room. *Id*. at *4. On another occasion, the child at issue in the case witnessed Mr. Davies throw a puppy across the room, breaking the puppy's leg. *Id*. When arguing about the possibility of a divorce, Mr. Davies kicked a glass patio door, severely cutting his foot, but managed to continue to follow his wife around the house to berate her while he bled profusely—all of which was witnessed by the child. *Id*. at *7–8. Finally, the district court in *Davies* also found credible Ms. Davies's allegations of sexual assault at the hands of her husband. *Id*. at *7.

Respondent's comparison of Mr. Davies and Petitioner is inapt. There is simply no evidence in the record to support a finding that Petitioner's conduct towards Respondent was observed by the children or puts the children at a grave risk of harm. *Cf*. *Ermini v. Vittori*, 758 F.3d 153, 164–165 (2d Cir. 2014) (finding grave risk of harm where the children were frequently hit by their father, father was "in the habit of striking the children," and children observed father shove mother's head into the kitchen cabinets and attempted to "suffocate" and "strangle" her.) N.V. recalled his parents fighting but did not report witnessing any physical violence to Respondent's expert.[4] (Hr'g Ex. R-Y at 8–9.) Similarly, R.V. told Respondent's expert that he did not have a "recollection of his parents [sic] conflict in Israel." (*Id*. at 8.) Moreover, despite the myriad of allegations brought to light in this proceeding, it is undisputed that Respondent never called the police to report any of the incidents described. (*See generally* June 1 Hr'g Tr.)

---

[4] N.V. did mention to Petitioner's expert that he witnessed two physical fights between his parents, but he could not recall anything about what he saw or when these fights took place. (Hr'g Ex. R-ZZ at 14.) Even if N.V. did witness these fights, the record supports a finding that these were sporadic and isolated incidents that do not present an intolerable level of grave risk to the children. *Souratgar*, 720 F. 3d at 104.

17

### ii.  Risk of Physical or Emotional Abuse from Petitioner

Respondent has never claimed that Petitioner ever physically abused any of the children. In fact, it is undisputed that the children did not report ever being abused by their father to the parties' expert witnesses.  (*See* Hr'g Ex. R-Y and Hr'g Ex. R-ZZ at 5.)  Respondent testified that Petitioner would "belittle" N.V. regarding school and homework, take his phone away, and that after these episodes N.V. would run to his mother and cry or try to shut himself in his room.  (June 1 Hr'g Tr. at 218:4-22.)  Specifically, it is alleged, that Petitioner would shout at N.V. and tell him that he needed to "succeed," "do better," "leave [his] phone alone," not be "stupid," and not be "stupid like [Petitioner]" because he didn't finish high school.  *Id*.  These allegations, while perhaps not the most pedagogically advanced, do not amount to a grave risk of physical or emotional abuse from Petitioner.  *But see Simcox,* 511 F.3d at 608 (father subjected children to "repeated beatings, hair pulling, ear pulling, and belt-whipping" and psychological abuse); *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (father spanked daughter and threatened to kill wife and children); *Walsh v. Walsh,* 221 F.3d 204, 221–22 (1st Cir. 2000) (one child diagnosed with PTSD as a result of physical abuse and father repeatedly violated court orders); *Blondin II,* 189 F.3d at 243 (father tied cord around daughter's neck and threatened to kill mother and daughter).

Unlike the cases in which "the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question," the allegations here regarding treatment of the children can be characterized as disciplinary in nature.  *Souratgar,* 720 F.3d at 105.  Indeed, while N.V. described his father as being "mean" to him, he reported to Respondent's expert that he loved his father.  (Hr'g Ex. R-Y at 8.)  Likewise, R.V. could not recall being put in situations in the home in which he "felt scared," and reported that his parents "would only get upset" with him "around

homework." (Hr'g Ex. R-ZZ at 18.) R.V. made clear that he "did not feel abused in any way by either parent." (*Id.*)

### iii. Risk from Petitioner's Drug Use

Respondent alleges that Petitioner abused drugs, left drugs lying around the home, and was "totally consumed" by drugs to the point that he was "unable to function as a parent." (Respt.'s Opp'n at 17.) Petitioner admitted to using drugs "recreationally" about once every month or two when he would go to an event or party. (May 25 Hr'g Tr. at 15:8-16:25.) Petitioner denied selling drugs, leaving drugs out at home, or using drugs on a daily basis. (*Id.*) Petitioner testified that he "used to smoke marijuana," "took ecstasy and cocaine," and tried to grow marijuana plants in the back yard; but has not used drugs since 2019. (*Id.*)

"Drug use, under certain circumstances, . . . may qualify as grave-risk conduct." *Mlynarski v. Pawezka*, 931 F. Supp. 2d 277, 284 (D. Mass. 2013), *aff'd*, 2013 WL 7899192 (1st Cir. May 8, 2013) (finding no grave risk where petitioner had "susceptibility to taking psychoactive substances" and occasionally smoked marijuana). Courts use a two-step approach to determine whether allegations of drug use qualify as a grave risk. "[T]he court must first determine whether the alleged . . . drug use in fact occurred. Beyond that, the court must consider as part of the grave risk analysis how such conduct, if confirmed, would affect the child were he to be returned to his habitual residence." *Id*. at 284–85 (internal citation omitted).

The parties dispute the amount of Petitioner's drug use, but there is no dispute over whether Petitioner used drugs around the children. Respondent admitted that she never witnessed Petitioner use drugs in front of the children. (June 1, 2021 Hr'g Tr. at 318:23- 319:8.) When asked about his exposure to drugs in Israel, N.V. reported that his father did drugs and used a "white substance," but that he could "not recall any strange behavior due to drugs on the part of his father."

(Hr'g Ex. R-ZZ at 14.)  R.V. recalled seeing marijuana plants in the backyard and reported that "his father was the more likely user," but did not have any further observations about drug use in the home.  (*Id.* at 18.)  From the the parties' written submissions and testimony, it is clear that the drug use at issue here does not rise to the level that puts the children at a grave risk of harm.  *But see Wertz v. Wertz*, 2018 WL 1575830, at *14 (W.D. Va. Mar. 30, 2018) (finding a grave risk of harm given the "sheer enormity" of drug abuse, including use of cocaine, heroin, crystal meth, marijuana, Ritalin, morphine, OxyContin, and Percocet, some of which was still ongoing.)

Respondent's claims that Petitioner poses a grave risk of harm to the children are undermined by the undisputed facts.  As with all the other allegations surrounding grave risk, it is undisputed that Respondent never called the police about Petitioner's actions.  Moreover, as late as August 26, 2019, approximately one month before her removal of the children, Respondent was willing to let her children travel unaccompanied to Israel twice a year and be alone with their father. (Hr'g Ex. R-G, ¶13 A-C.)  Respondent would not feel comfortable letting the children travel to and stay with Petitioner in Israel if she thought that his behavior and drug abuse would truly put the children at risk.

In sum, Respondent has failed to meet her burden to establish by clear and convincing evidence that the children's return to Israel would expose them to a "grave risk of physical or psychological harm or otherwise place [them] in an intolerable situation." Convention, Art. 13(b).

### iv.  Ameliorative Measures

As noted above, even where there is a grave risk of harm from repatriation, the Court must consider whether any ameliorative measures, taken either by the parents or legal authorities of the state having jurisdiction over custody, could reduce the risk associated with the child's repatriation. *Blondin II*, 189 F.3d at 248.  Respondent has not established that an Israeli court could not provide

adequate protection for the children during any divorce or custody proceedings.  Moreover, the effect of this decision is only to order the return of the children to Israel.  The children and Respondent are not required by this Court to live with Petitioner again, and the parties are free to devise their own living and custody arrangements or seek the intervention of an Israeli court.  Thus, the grave risk exception is inapplicable.

### C.  The Mature Child Exception

Respondent's third and final defense relies on an unnumbered provision in Article 13 of the Hague Convention, which provides that a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, art. 13.  There is no "minimum age at which a child is old enough and mature enough to [object and] trigger this provision."[5]  *Blondin IV*, 238 F.3d at 166.  However, the exception must be "construed narrowly so [its] application does not 'undermine the express purposes of the Convention.'"  *Yang v. Tsui*, 499 F.3d 259, 278 (3d Cir. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)).  Notably, proving that the defense applies is not dispositive; courts ultimately retain discretion to order repatriation despite that showing.  *Blondin II*, 189 F.3d at 246 n.4; *see also Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 204 (E.D.N.Y. 2010) ("[I]t bears emphasis that the Convention merely calls for a court to 'take account of' a mature child's objection to return, not to accede to it automatically").

Moreover, when tasked with repatriation decisions under the Hague Convention, a court does not "determine whether a child is happy where it currently is, but whether one parent is

---

[5] *See* Pérez-Vera Report ("[A]ll efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary.  It seemed best to leave the application of this clause to the discretion of the competent authorities.").

seeking unilaterally to alter the status quo with regard to the primary locus of the child's life." *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001), *abrogated on other grounds sub nom. Monasky v. Taglieri*, 140 S. Ct. 719 (2020).   Generally, "[a] child's expression of a *preference* to remain in the United States rather than a particularized *objection* to repatriation may provide a basis for a court to find the mature child exception inapplicable." *Haimdas*, 720 F. Supp at 206 (emphasis added); *see also Yang*, 499 F.3d at 280 (ordering repatriation where the child "possessed a more generalized desire to remain in Pittsburgh similar to that of any ten-year-old having to move to a new location . . . [and] such reasons were not necessarily sufficient to invoke the exception").   "[T]he notion of 'objections' . . . is far stronger and more restrictive than that of 'wishes' in a custody case." *Haimdas*, 720 F. Supp at 206.   Thus, a "sincere preference" to remain in the United States, as opposed to an "unequivocal objection" to return to the child's home country, "cannot be an adequate basis . . . to 'disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return.'"   *Id*. at 209 (citations omitted).

Here, Respondent asserts the defense by arguing that N.V. and R.V. object to returning to Israel.[6]   (Respt.'s Opp'n at 13.)   But cases under the Hague Convention are "not a matter of magic words or talismanic language"—neither an intentional use of the word "objection" nor an inadvertent use of the word "preference" is dispositive to determining whether the mature child defense applies.   *Rodriguez v. Yanez*, 817 F.3d 466, 477 (5th Cir. 2016).   Having reviewed expert report submissions reflecting a combined 5 hours and 50 minutes of clinical interviews with R.V. and N.V,[7] the testimony of the parties from the two-day evidentiary hearing, and the post-trial

---

[6] The parties do not dispute that E.V, at just four years old, is too young for her objections to be considered.

[7] *See* Hr'g Ex. R-Y (Favaro Rep.) at 3; Hr'g Ex. R-ZZ at 3.

briefing, this Court concludes that Respondent's child objection defense is unavailing and declines to apply the exception.[8]

   **i. N.V.**

   Under this standard, neither one of the expert reports suggests that N.V. holds an unequivocal, bona fide objection to repatriation.  In his interview with Dr. Favaro, N.V., who is twelve years old, stated that returning to Israel would make him "anxious and upset" because "[h]e likes the school here [in New York], . . . has made good friends [in New York], and loves living with his maternal grandparents and would miss his family life if he were forced to return [to Israel]."  (Hr'g Ex. R-Y at 8; *see also* Hr'g Ex. R-ZZ at 15-16.)  This statement does not indicate more than a preference to remain in the United States.  *Compare In re Skrodzki*, 642 F. Supp. 2d 108, 118 (E.D.N.Y. 2007) ("[The child's] declaration only expresses a well-adjustment to life in

---

[8] Respondent has made multiple requests to have this Court conduct *in camera* interviews of N.V. and R.V. and to hear testimony from the experts. (*See* ECF Nos. 36, 64.) Both of these requests were denied. At the end of the second day of the evidentiary hearing, the Court granted the Respondent another opportunity to submit a request for the Court to conduct in camera interviews of the children and hear further testimony from the experts and additional fact witnesses. (June 1 Hr'g Tr. at 346:17-347:22.) The Court directed that such submission should include a description of probative information such witnessed would testify to. (*Id*.) Respondent submitted their brief on June 10, 2021 and does not add any information the Court has not previously considered. (ECF No. 76.) As such, Respondent's request is DENIED. Neither the Hague Convention nor ICARA require an evidentiary hearing or a full trial on the merits. *March v. Levine*, 136 F. Supp. 2d 831, 833-34 (M.D. Tenn. 2001); *see also March v. Levine*, 249 F.3d 462, 474 (6th Cir. 2001) (holding that district court did not abuse its discretion in granting summary judgment without a hearing); *Van De Sande v. Van De Sande*, 431 F.3d 567, 572 (7th Cir. 2005) (same). The Court heard oral argument on the Petitioner's summary judgment motion on May 6, 2021 and then held a two-day evidentiary hearing on May 25 and June 1, 2021 where both parents testified under oath. Respondent has proffered no evidence about what an *in camera* examination of the children would add beyond what the children have already said to the experts retained in this case. The parties have filed extensive briefing in this case, including two thorough expert reports, and any further testimony is likely to be cumulative and dilatory. Moreover, the Court has thus far kept the children from being further ensnared in their parent's fight and will continue to do so by declining to make them sit for unnecessary *in camera* interviews. *Cf. Nissim*, 394 F. Supp. at 399 ("Thus far, the Court has employed measures to protect and shield the Child from her parent's bicontinental quarrel, and the Court will continue to do so by refraining from requiring the Child to testify or choose between her parents.").

the United States and a simple preference for the luxuries of living in New York, not an objection to returning to Poland.  Even if life in the United States is moderately preferable to life in Poland for a young child, this Court must take seriously its obligation under the Hague Convention to return an abducted child to the country of its habitual residence."), *with Dubikovskyy v. Goun*, 2021 WL 456634, at * 7 ("While [the child] clearly did not want to even suggest that she objected to being with her father, she made clear she did not want to return to Switzerland.").  Unlike *Dubivoskyy*, N.V.'s wishes do not rise to the level of an unequivocal objection to return to Israel. While N.V. expresses that he would be "anxious and upset" to return, his stated reasons for feeling that way revolve around his enjoyment of his new school[9] and new friends, and that he likes living with his maternal grandparents.  These reasons do not indicate a substantial basis for his objection to a return to Israel, so much as it reflects his enjoyment of his current lifestyle in New York.  *See Gonzalez Locicero v. Nazor Lurashi*, 321 F. Supp. 2d 295, 298 (D.P.R. 2004) ("The fact that the child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sports activities and outings, is not enough . . . to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return.").

Respondent argues that N.V. "expresses specific reasons for objecting to being returned," such as his fear of spending time with Petitioner.  (Respt.'s Opp'n at 13.)  Respondent relies on *Colon v. Mejia Montufar*, 470 F. Supp. 3d 1280 (S.D. Fla. 2020), as support, but it is

---

[9] N.V. complained of bullying incidents at his school in Israel and both of his parents testified that there was a stretch of time that N.V. refused to go to school because of such incidents. (June 1 Hr'g Tr. at 208:24-209:17; Hr'g Ex. R-X.)  While Respondent argues that N.V.'s desire to stay in New York is reasonable because he is no longer experiencing such bullying, there is reason to doubt the soundness of this argument. (Respt.'s Post-Hr'g Br. at 6.) The bulk of N.V.'s schooling in the United States has taken place during the COVID-19 pandemic when New York City schools have provided educational instruction almost entirely by remote means.  Thus, his good feelings about New York schools and friends may not be entirely well-founded as there has almost certainly been less exposure to peers.  In many ways his educational experience in New York is not comparable to his daily experience in Israel.  In any event, allowing all three of the children to stay in the United States simply because their sibling has had fewer bullying incidents and enjoys a new environment better would render the Hague Convention toothless.

distinguishable.  In that case, the court refused to "attribute much weight to [the child's] objection based on his preference to the United States," permitting the child objection defense only because the child stated that he would "rather be dead than live in fear of the gang members" in his home country and had additionally "set forth particularized reasons underlying [his] objection, rather than just a mere preference to remain with one parent."  *Colon*, 470 F. Supp. at 1297.

Unlike the child in *Colon*, N.V. does not exhibit any similar fears of returning to Israel generally, nor does he express "particularized" reasons underlying an objection to returning to the same country as his father.  That he "could not recall any positive memories about his home life in Israel, nor could he recall any positive memories about his former country, Israel, nor could he recall anything he liked about Israel and there were no aspects of Israel he missed" is more indicative of indifference than of a true objection. (Hr'g Ex. R-ZZ at 14.)  Although N.V. reported general fighting and screaming between his parents, he did not indicate that any harm came to him personally.  His comments to the experts also do not indicate, explicitly or implicitly, any fear of physical or psychological harm.  Indeed, N.V. expressed "love and affection for his father" to Respondent's own expert.  (Hr'g Ex. R-Y at 8.)  Moreover, N.V.'s Israeli psychologist recommended that N.V. would benefit from "guidance from *both* parents in order to help them be stabilizing factors for him in stressful situations." (*Id*. at 16) (emphasis added.)

While the Court does not wish to minimize N.V.'s preference for living in the United States, the Court must be mindful of the Hague Convention's narrow aim of mandatory repatriation in situations involving wrongful removal and the Convention's explicit foreclosure on determinations regarding the merits of any custody issue. Hague Convention, art. 19.  That N.V. "reports being close to his mother," Hr'g Ex. R-Y at 8, "did not appreciate his father," Hr'g Ex. R-ZZ at 16, and appreciated his mother "more," Hr'g Ex. R-ZZ at 16, speaks to custody

determinations that summarily lie beyond the scope of the Hague Convention.  *See Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 600 (2013 D.S.C.) (ordering repatriation where "the instant dispute is a custody matter involving the children's preferences with regard to which parent they want to live with, not well-reasoned particularized objections to their return to their place of habitual residence").  N.V.'s statements indicate a preference to remain in the United States rather than a particularized objection to repatriation to Israel.  Thus, based on his comments, this Court declines to apply the discretionary mature child exception.

### ii. R.V.

The case for declining to apply the mature child exception becomes even stronger after examining R.V.'s alleged objections.  According to Petitioner's expert, R.V., who recently turned fifteen, "reported that life in Israel 'was not bad.'"  (Hr'g Ex. R-ZZ at 26.)  Respondent's expert, meanwhile, reported that R.V. "expressed a preference to stay in the United States and that the quality of his life would not be satisfying if he returned to Israel."  (Hr'g Ex. R-Y at 7.)   Again, there is no unequivocal objection here—neither a mere preference nor expected quality of life are relevant considerations under the Hague Convention.

R.V. "at no point . . . express[ed] a clear objection to his return to Israel."  (Hr'g Ex. R-ZZ at 4.)  Even Respondent's expert reported that R.V. was "nonplussed when [he] broached the subject of where [R.V.] would like to live," after which R.V. stated: "I am adaptable, I can live anywhere."  (Hr'g Ex. R-Y Rep. at 7.)  Respondent does not meet her burden of showing that R.V. unequivocally objects to repatriation to Israel.  Accordingly, this Court declines to apply the discretionary mature child exception.

### iii. Repatriation of All Three Children is Warranted

Assuming, arguendo, that N.V. and R.V. have reached "an age and degree of maturity at which it is appropriate to take account of [their] views," the child objection exception still would not apply.  Hague Convention, art. 13.  The two children's statements to the psychological experts reflect wishes or preferences to remain in the United States rather than unequivocal objections to return to Israel.  These preferences are simply not enough to overcome the Hague Convention's "strong presumption in favor of return." *Rodriguez*, 817 F.3d at 477.

Here, only N.V.'s statements come close to stating an objection. But even if the Court were to credit N.V.'s statement as an objection invoking the mature child exception, this Court would still exercise its discretion to order the return of all three of the children to Israel.  It is undesirable to place N.V. in the position of deciding the geographic fate of his two siblings, even if temporarily. It is even more undesirable to separate the three children.  *See Leonard v. Lentz*, 297 F. Supp.3d 874 (N.D. Iowa 2017) ("To return only two siblings would be detrimental to all three.").  Indeed, this Court refuses to do so, especially where the youngest child, E.V., is too young for her views to be considered, and where R.V. and N.V.'s alleged objections are mere preferences relevant only to custody determinations beyond the scope of the Hague Convention.  The effect of this Order is only to return the children to Israel, and put the matter of custody before an Israeli Court of competent jurisdiction. This Order does not determine custody or the long-term residence of the children.  If an Israeli Court believes it is in the children's best interest to reside in the United States, it has the power to decide so.  For now, under the Hague Convention, repatriation is warranted.

## V.   CONCLUSION

Petitioner's Motion for Summary Judgment, (ECF No. 38), is GRANTED.  Respondent is hereby ORDERED to return R.V., N.V., and E.V. to Israel.  The children are to be repatriated to Israel no later than August 31, 2021, in order to be enrolled and commence the school year in September in Israel.

Dated: New York, New York
      July 22, 2021

                                   SO ORDERED.

                                  GEORGE B. DANIELS
                                  UNITED STATES DISTRICT JUDGE